No. 57,279

BINGO CATERING AND SUPPLIES, INC.; TRI G & L, INC.; BINGO ALLEY, INC.; MID AMERICA CONSULTING, INC.; BINGO WINNERS, INC.; B.F.H. INVESTMENTS, INC.; BENTON BUILDING COMPANY; MERRIAM SERTOMA CLUB, INC.; *Appellees,* v. HARLEY T. DUNCAN, Secretary of Revenue of the State of Kansas, *Appellant.*

(699 P.2d 512)

Opinion filed May 10, 1985.

*D. Philip Wilkes,* of Legal Services Bureau, Department of Revenue, argued the cause, and *William L. Edds,* general counsel, Legal Services Bureau, Department of Revenue, was with him on the brief for appellant.

*John Ivan,* of Shawnee Mission, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

MILLER, J.: This is an appeal by the defendant, the Secretary of Revenue, from an order of the Shawnee County District Court holding paragraphs (q) and (s) of K.S.A. 79-4706 unconstitutional, and a cross-appeal by the plaintiffs, Bingo Catering and Supplies, Inc., *et al.,* from the same order finding paragraph (r) of the same statute constitutional. The sole issue before us is the constitutionality of those three paragraphs, which were added to the statute in 1984.

Section 3 of Article 15 of the Constitution of Kansas prohibits lotteries. In 1971, the Kansas Legislature amended a part of our criminal code, K.S.A. 1971 Supp. 21-4302, in order to exclude bingo from the gambling laws. In *State v. Nelson,* 210 Kan. 439, 502 P.2d 841 (1972), we held that the statutory attempt to legalize bingo was inconsistent with the anti-lottery provisions of our constitution. Thereafter, in 1974, the Constitution of Kansas was amended by the adoption of Article 15, section 3a, which reads as follows:

"§ 3a. . . . Notwithstanding the provisions of section 3 of article 15 of the constitution of the state of Kansas the legislature may regulate, license and tax the operation or conduct of games of 'bingo,' as defined by law, by bona fide nonprofit religious, charitable, fraternal, educational and veterans organizations."

The legislature followed in 1975 by enacting statutes providing for the licensing, regulation and taxation of bingo. One of those statutes, 79-4706, provided for extensive restrictions on the conduct of bingo games. That section was amended in 1984 to add the three paragraphs now before us. These read:

"Games of bingo managed, operated or conducted by organizations licensed under the provisions of this act shall be managed, operated or conducted subject to rules and regulations adopted by the secretary of revenue and the following restrictions:

. . . .

"(q) No premises shall be used for the management, operation or conduct of bingo games on more than three calendar days in any one week.

"(r) No premises shall be subdivided to provide multiple premises where games of bingo are managed, operated or conducted, whether or not the multiple premises have different addresses.

"(s) No game of bingo shall be managed, operated or conducted on leased premises if at any time during the immediately preceding 44 hours the premises, or any premises within 1,000 feet of them, have been used for the management, operation or conduct of a game of bingo."

The 1984 amendments were to become effective July 1, 1984. On June 27, 1984, a petition for declaratory judgment and injunctive relief was filed in this action. The plaintiffs are Bingo Catering and Supplies, Inc.; Tri G & L, Inc.; Bingo Alley, Inc.; Mid America Consulting, Inc.; Bingo Winners, Inc.; B.F.H. Investments, Inc.; Benton Building Company and the Merriam Sertoma Club, Inc. The Merriam Sertoma Club, Inc., is a nonprofit charitable and fraternal organization which leases premises from others and conducts bingo games thereon under a license issued by the Secretary of Revenue. The other plaintiffs are lessors who lease property to various nonprofit organizations, which organizations in turn conduct bingo games on the leased premises. Plaintiffs contend that paragraphs (q), (r) and (s) are unconstitutional in that they constitute an unlawful interference with the rights of the plaintiffs to contract, they interfere with contracts presently in force, and they violate the plaintiffs' rights to due process and equal protection of the law. Finally, plaintiffs contend that the amendments are unreasonable, oppressive and

an invalid exercise of the State's police power. Plaintiffs attached to and made a part of their petition two affidavits, one by Robert Russell, chairman of the board of the Merriam Sertoma Club, Inc., and the other by Stan Laforet, secretary of Tri G & L, Inc. On the basis of the petition and the affidavits, the trial court entered a temporary restraining order, restraining the Secretary from enforcing paragraphs (q), (r) and (s). That order has not been modified or revoked.

The defendant answered, admitted the factual allegations of the petition, denied any constitutional infirmities of the cited paragraphs of the act, and asked that the petition be dismissed.

The matter was submitted to the court on the basis of the pleadings, the affidavits, oral argument and briefs of the parties. The trial court found paragraphs (q) and (s) to be unconstitutional and upheld paragraph (r). From that order the parties appeal.

The basic principles which an appellate court must apply in determining the constitutionality of a statute are set forth in *City of Baxter Springs v. Bryant,* 226 Kan. 383, 385-86, 598 P.2d 1051 (1979):

" 'The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution. [Citations omitted.]

" 'In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it and if there is any reasonable way to construe the statute as constitutionally valid, that should be done. [Citations omitted.]

" 'Statutes are not stricken down unless the infringement of the superior law is clear beyond substantial doubt. [Citations omitted.]

. . . .

" 'The propriety, wisdom, necessity and expedience of legislation are exclusively matters for legislative determination and courts will not invalidate laws, otherwise constitutional, because the members of the court do not consider the statute in the public interest of the state, since, necessarily, what the views of members of the court may be upon the subject is wholly immaterial and it is not the province nor the right of courts to determine the wisdom of legislation touching the public interest as that is a legislative function with which courts cannot interfere. [Citations omitted.]' *State ex rel. Schneider v. Kennedy,* 225 Kan. 13, 20-21, 587 P.2d 844 (1978).

"The general rule for reviewing statutes or ordinances enacted pursuant to the police power is stated in City of Wichita v. White, 205 Kan. 408, 469 P.2d 287 (1970), as follows:

" 'In reviewing statutes such as these, the court begins with the proposition that all presumptions are in favor of their validity. (*State, ex rel., v. Fairmont Foods Co.,* 196 Kan. 73, 77, 410 P.2d 308; and *Tilley v. Keller Truck & Implement Corp.,* 200 Kan. 641, 438 P.2d 128.) The court does not sit in judgment on the

merits of such legislation. If the statute here challenged does not contravene significant constitutional or inherent rights of individuals, if the classification on which it is based is reasonable, if it is within the scope of the police powers of the state, if it is appropriately related to a proper purpose of such police power, the statute is not to be invalidated by the judicial arm of government.' (p. 409.)

"In *State, ex rel., v. Fairmont Foods Co.*, 196 Kan. 73, 76-77, 410 P.2d 308 (1966), we said:

" 'Once a subject is found to be within the scope of the state's police power, the only limitations upon the exercise of such power are that the regulations must have reference in fact to the welfare of society and must be fairly designed to protect the public against the evils which might otherwise occur. Within these limits the legislature is the sole judge of the nature and extent of the measures necessary to accomplish its purpose. [Citations omitted.]

. . . .

" 'The reasonableness of restrictions imposed by the legislature by the exercise of the police power is a judicial matter, and all presumptions are in favor of constitutionality of the act. Within the zone of doubt and fair debate legislation is conclusive upon the court and must be upheld. [Citations omitted.]' "

In the *Delight Wholesale* cases, we discussed legislation enacted pursuant to the police power. In *Delight Wholesale Co. v. City of Overland Park*, 203 Kan. 99, Syl. ¶ 4, 453 P.2d 82 (1969) (*Delight I*), we said:

"While the police power is wide in its scope and gives a governmental body broad power to enact laws to promote the health, morals, security and welfare of the people, and further, a large discretion is vested in it to determine for itself what is deleterious to health, morals or is inimical to public welfare, it cannot under the guise of the police power enact unreasonable and oppressive legislation or that which is in violation of the fundamental law."

Later, in *Delight Wholesale Co. v. City of Prairie Village*, 208 Kan. 246, Syl. ¶ 2, 491 P.2d 910 (1971)(*Delight II*), we said:

"The police power is wide in scope and gives the governmental body broad powers to enact laws to promote the health, morals, security, and welfare of the people. Broad discretion is vested in the governing body to determine for itself what is deleterious to the health or morals, or which is inimical to public welfare. However, the governing body does not possess plenary power to pass legislation that is arbitrary, oppressive, and capricious, and which bears no substantial relationship to the public safety and welfare."

Under the constitutional provision quoted above, the operation of bingo games is a regulated industry. It is controlled by regulations issued by the Secretary and also by statute. The regulation of bingo falls within the police power of the state, and the regulation must be reasonable and bear a rational relationship to the public welfare.

Let us now examine the sections of the statute. Section (q) limits bingo games on any one premises to three calendar days per week. In reviewing this section, the trial court said:

"The Court first examines the restrictions found in paragraph (q) of K.S.A. 79-4706. This section provides that bingo games may not be played upon any one premise more than three calendar days in one week.

"The defendant, in his brief, points out that the restrictions imposed by paragraph (q) apply to all licensed bingo premises. Yet the defendant also states that the intent of the legislature in enacting paragraph (q) was to restrict the spread in recent years of commercialized 'bingo parlors.' The defendant contends that the danger perceived by the legislature 'was that churches and fraternal and veterans clubs would eventually be driven out of business by the more glamorous and convenient parlors.'

"In determining the constitutionality of paragraph (q), the Court first notes that there is no support before this Court for the claim that nonprofit organizations will be 'driven out of business' by the 'glamorous and convenient parlors.' Secondly, even if such a risk existed, there is no evidence that limiting the playing of bingo to three days a week on all premises will have the effect of equalizing competition between parlor facilities and organizations with their own facilities or that such an objective would be 'morally' desirable. Rather, as plaintiffs point out in their brief, the many nonprofit organizations that currently lease premises because they do not have their own facilities in which to play bingo would be forced to curtail or limit their fundraising activities because of the unavailability of leased premises. Also, many nonprofit organizations which do have their own premises on which to play bingo, currently play bingo more than three nights a week. These organizations, in addition to organizations that lease premises, would be adversely affected by the new restriction.

"The Court has not overlooked the cases from other jurisdictions cited by the defendant as support for restricting the playing of bingo on any one premise to three days a week. The Court does not find the holdings of these courts to be persuasive, nor are they controlling in this jurisdiction.

"This particular regulation bears no substantial relation to the health, safety, morals or general welfare of the public. Further, the enactment operates adversely upon one economic sector of the 'bingo business' to the profit of others, in violation of constitutional principles of equal protection of the law. Accordingly, the Court finds paragraph (q) of K.S.A. 79-4706 to be unconstitutional."

The only evidence before the trial court consists of the affidavits. That of Robert Russell, of the Merriam Sertoma Club, Inc., states that that club leases from Tri G & L, Inc., the westernmost part of a divided building; that it has been advised if sections (q), (r) and (s) go into effect, that part of the building Sertoma leases will be closed; that Sertoma has no premises of its own, cannot find suitable alternative space to lease, and Sertoma and similar organizations will have their income, used for charitable purposes, drastically reduced if the sections are enforced.

The affidavit of Stan Laforet, secretary of Tri G & L, Inc., states that Tri G & L is beginning its fourth year as the lessee under a twenty-year lease with the Safeway Company for a large building in Shawnee, Kansas. The building is divided in the center by a partition wall and each side of the building has a separate address and is separately leased to licensed nonprofit organizations for the purpose of operating and conducting bingo games. It also has a three-year lease on a building in Lawrence, Kansas; it subleases that building to nonprofit organizations licensed to operate bingo games therein. It has been notified by the Department of Revenue that it must remove the partition in the Shawnee building or it may only use one side of that building for bingo and bingo may be played on only three calendar days per week. It has also been notified that it may only lease its Lawrence building for bingo on three calendar days per week. Its leasing arrangements with the various charitable organizations have been approved by the Department of Revenue. It will sustain a substantial loss if the new paragraphs are enforced. Some of its leases with nonprofit organizations for the year beginning July 1, 1984, will be rendered null and void; its long-term lease with Safeway will be irreparably harmed. Other landlords who are leasing premises to nonprofit organizations for bingo will suffer similarly. Many of the organizations presently leasing premises for bingo will either be excluded from using bingo as a fund-raising activity or their fund-raising potential will be substantially reduced. Also, the state will lose approximately $1 million dollars during the fiscal year beginning July 1, 1984, from loss of sales taxes and bingo excise taxes, directly related to the economical impact of paragraphs (q), (r) and (s).

We start with the presumption that the legislative enactment is valid. The Secretary, defendant in this action, does not initially have any burden of proof. Instead, the burden of proof is upon those challenging the statute to introduce substantial, competent evidence to support their claim that the statute is unconstitutional. Once such evidence has been introduced then, and only then, does the burden of going forward with the evidence shift. The district court did not have before it, nor do we have before us, the evidence upon which the legislature concluded that the three-calendar-day limitation was in the public interest. The affidavits do not speak to the effect on the public of premises

used for bingo regularly and sometimes daily, or to the effect on the public of divided premises wherein successive games of bingo may be held, and the same players may seek successive maximum prizes. The affidavits do indicate that nonprofit organizations which currently lease premises may be forced to curtail or limit their fund-raising activities. Upon the only evidence in the record, however, we cannot conclude that the limitations of paragraph (q) to the use of single premises for the conduct of bingo games to three calendar days in any one week is unreasonable or that it violates the equal protection rights of any of the parties. No one has any constitutional right to operate bingo games every day. We conclude that the three-day limitation of paragraph (q) of K.S.A. 79-4706 has not been shown to be wholly unrelated to the general welfare.

Two cases from other jurisdictions support our holding. In *Theriot v. Terrebonne Parish Police Jury*, 436 So. 2d 515 (La. 1983), the Terrebonne Parish ordinance limited the use of any facility for raffles, bingo or keno games to not more than two days during any calendar week. The Louisiana Supreme Court held that the limitation "is rationally related to the control and supervision of such games within the parish and does not offend the constitutional guarantees of substantive due process." 436 So.2d at 521. The court upheld the ordinance. Similarly, in *Alcoholic Resocialization Conditioning Help, Inc. v. State*, 206 Neb. 788, 295 N.W.2d 281 (1980), the Nebraska statute as originally enacted provided that not more than ten bingo occasions per month per license could be held at any one premises. That statute was amended in 1979 to provide that not more than two bingo occasions per week may be held within a single structure or building irrespective of the number of licensees authorized to hold bingo occasions on the premises. The Nebraska Supreme Court upheld the amendment saying:

"The 1979 amendment to § 9-146 appears to have been designed to discourage the establishment of 'bingo halls' where patrons would be able to attend a bingo occasion every night of the week. The statutory provision will tend to encourage a wider geographical distribution of locations where bingo games may be held and avoid the concentration of bingo occasions in a relatively few locations.

"It may be conceded that, to some extent, the change in the statute will place a hardship on smaller nonprofit organizations, some of which may experience difficulty in finding suitable locations and obtaining the equipment required in order for them to conduct bingo games. We do not believe this circumstance

makes the regulation imposed by the 1979 amendment to § 9-146 so unreasonable that it is invalid.

"The appellants argue that the amendment to the statute impairs the obligation of contracts, interferes with vested rights, and prevents them from freely contracting in the future. To some extent, this is true of most statutes which are regulatory in nature. The ultimate question is one of reasonableness.

"The statute does not interfere with the use of the property leased by Mrs. Rankin except that the number of bingo occasions which may be held in the premises is limited to two per week. The licenses which the other plaintiffs and intervenors hold are not contracts but are subject to whatever reasonable regulation the Legislature may impose from time to time.

"Similar contentions were made in *Beisner v. Cochran*, 138 Neb. 445, 293 N.W. 289 (1940). . . . where we said:

'[A] citizen has no vested right in statutory licenses, permits and privileges. This being true, a license to carry on a particular trade may be recalled by legislative action at any time. No one has a vested right to be protected against consequential injuries arising from a proper exercise of public powers. That the state under its police power may regulate the use of motor vehicles on the public highways cannot be questioned. Consequently, any incidental damage resulting from a legislative invocation of its police power does not give rise to a right to enjoin the act or to claim compensation from the public. And, likewise, the amendment or repeal of an existing police regulation must necessarily follow the same principle.' [138 Neb. at 447-48.]

. . . .

"The appellant Rankin further contends that the State is estopped to enforce § 9-146, as amended, against her because she entered into the lease of the property in reliance upon the provisions of the statute as they existed prior to the amendment. The difficulty with this contention is that the appellant Rankin had no vested right in the statute and no right to rely on an assumption that no further restrictions or regulations might be imposed upon the operation of bingo games. There is no basis for a claim of estoppel in this situation.

"The appellants are not entitled to a declaration that the 1979 amendment to § 9-146 was invalid." 206 Neb. at 790-93.

The original statutory regulation in Kansas contained no restriction on the number of days per week that bingo could be played in any given location. Paragraph (q) adds this limitation. Plaintiffs-lessors admittedly are leasing their premises for the holding of bingo games on more than three days per week. This concentrates the activity into a regular occurrence at a single location, or where the premises are subdivided at adjoining locations. This is obviously a specific target of the challenged legislation. Under the constitutional article, bingo is authorized when operated by bona fide nonprofit religious, charitable, fraternal, educational and veterans' organizations. The limitation prescribed by paragraph (q) will necessarily limit the number of occasions that bingo can be played at one specific place, and will

distribute the bingo games over a much wider area. We cannot say that this is not a furtherance of the constitutional mandate, nor can we say that it bears no substantial relationship to the morals or general welfare of the public. We agree that the regulation may interfere with the contractual rights of the plaintiffs, but the contracts are, of course, subject to the licensing and regulatory provisions imposed by the legislature in this regulated industry. The constitutional prohibition against the impairment of contracts is subject to the exercise by the state of its police power. As stated in 16A C.J.S., Constitutional Law § 283:

"The constitutional prohibition against impairing the obligation of contracts [does] . . . . not prevent a proper exercise by the state of its police power by enacting regulations reasonably necessary to secure the health, safety, morals, comfort, or general welfare of the community . . . even though contracts may thereby be affected, since such matters cannot be placed by contract beyond the power of the state to regulate and control them.

". . . All contracts are made with reference to the possible exercise of the police power of the government and with the possibility of such legislation as an implied term of the law thereof. Whether made by the state itself, by municipal corporations, or by individuals or private corporations, the contracts cannot extend to defeat legitimate government authority. They are subject to be interfered with, or otherwise affected by, subsequent statutes enacted in a bona fide and appropriate exercise of the police power . . . [and] do not, by reason of the contracts clause of the Constitution, enjoy any immunity from such legislation, regardless of whether the legislative action affects contracts incidentally, or directly or indirectly."

As the United States Supreme Court said in *Energy Reserves Group v. Kansas Power & Light,* 459 U.S. 400, 410, 74 L.Ed.2d 569, 103 S.Ct. 697 (1983):

"Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.' "

We agree with the rationale of the Nebraska Supreme Court in *Alcoholic Resocialization Conditioning Help, Inc. v. State,* 206 Neb. 788, and hold that the regulation imposed by paragraph (q) of our statute is constitutional.

We turn now to paragraph (r) of the statute, which provides that no premises where bingo is played shall be subdivided to provide multiple locations where games of bingo may be conducted. In this connection the trial court said:

"The Court next considers the constitutionality of section (r) of K.S.A. 79-4706 which provides that no premises where bingo is played may be subdivided to

provide for multiple premises. This restriction was intended to put a stop to the practice of dividing a building into two rooms and obtaining a bingo premises registration certificate for each room as a separate location. Prior to this enactment, the Department of Revenue had issued bingo premises registration certificates for two such premises within the state.

"In these two instances, the operators have leased a large building from the owner, constructed a wall down the middle and designated each half with a separate address. While each side of the building has its own tables, chairs, and various bingo equipment, the two halves share restrooms, snack bars, and other facilities. According to the defendant's brief, it is typical for one organization to conduct 10-15 bingo games in one room and after a brief intermission, another organization will conduct 10-15 games in the other room. Since the rooms are connected by interior doors, this is a convenient way for players to go from the first set of games in one room to the second set of games in the other room.

"While this may be a convenient way for bingo players to play as many games as possible, it is also an attempt to bypass K.S.A. 79-4706(f) and (g) which provide that:

" '(f) The aggregate value of all prizes including the retail value of all merchandise awarded or offered by any such organization in any single day to winners of games of bingo shall not exceed $1,200;

" '(g) The total number of games managed, operated or conducted by any licensee in any one day shall not exceed 25 and not more than five of such games shall be jackpot or special games and not more than one licensee may conduct bingo games at a given licensed location in any one calendar day.'

"By dividing a building into two rooms and obtaining a bingo registration certificate for each side of the room, the operators of such premises (and the various nonprofit organizations who lease them) are able to essentially hold two bingo games in what is really only one location [in violation of paragraph (g).] Bingo players are also able to play for prizes of up to $2,400 rather than just $1,200 by simply going from one room to another within the same building [in violation of paragraph (f).]

"The legislature in enacting section (r) of K.S.A. 79-4706 has attempted to prevent bingo organizations from circumventing existing law, a valid and reasonable exercise of the state's police power.

"Accordingly, the Court finds section (r) of K.S.A. 79-4706 to be a valid and reasonable exercise of the state's police power and therefore constitutional."

We agree with the holding and rationale of the trial court with respect to paragraph (r). It bolsters the regulations included in paragraphs (f) and (g) of the statute, quoted in the trial court's memorandum decision and order, which limit the aggregate value of prizes awarded and the number of games played at any single location on any single day, and thus paragraph (r) prevents the circumvention of existing regulations. The only evidence—the affidavits—does not show that subdivision of the buildings has been effected for any other purpose. We hold that paragraph (r) is constitutional.

Finally, we turn to paragraph (s), which provides that no game of bingo shall be conducted on leased premises if, at any time during the immediately preceding 44 hours, games of bingo have been conducted on the leased premises or on any other premises within 1,000 feet. The trial court held:

"The final section of K.S.A. 79-4706 challenged as unconstitutional by the plaintiffs is paragraph (s). This paragraph provides that no game of bingo shall be played on leased premises if a game of bingo has been played at any time within the immediately preceding 44 hours on that premises or any premises within 1,000 feet of it.

"Unlike paragraph (q), this restriction applies only to leased premises. According to the defendant, this paragraph is an attempt by the legislature to 'give some relief to nonprofit organizations conducting bingo games in their own facilities which are situated in close proximity to one or more parlors.' The effect of this particular provision, however, will be to unfairly discriminate between those nonprofit groups which own their own facilities in which to play bingo and nonprofit organizations which must lease their facilities from other nonprofit organizations or from commercially operated 'for-profit' parlors.

"This attempt to provide more favorable treatment for nonprofit organizations owning their own facilities can be compared to a situation before the Kansas Supreme Court in *City of Baxter Springs v. Bryant*, 226 Kan. 383, 598 P.2d 1051 (1979). In that case, the City of Baxter Springs passed an ordinance making it unlawful for any holder of a cereal malt beverage license issued by the city to 'suffer, permit or allow any dancing' upon the premises covered by the license. The City argued that such a ban would mean that fewer persons would patronize the licensed premises and thus there would be less intoxication.

"The court in *Baxter Springs* pointed out that such an ordinance would unfairly discriminate against those who patronized licensed cereal malt beverage establishments (perhaps because of economic necessity) as opposed to those who had membership with private clubs that allowed dancing.

"As in *Baxter Springs*, nonprofit organizations which must lease premises in which to play bingo (because of economic necessity or otherwise) are subject to much stricter regulation than those nonprofit organizations which have their own premises.

"In determining whether or not such a distinction is constitutional, the Kansas Supreme Court's reasoning in *Baxter Springs* is also instructive:

't if those persons who do patronize the establishment are not permitted to dance, and must therefore refrain from that exercise while sitting and consuming cereal malt beverages, will less intoxication result? No statistics have been provided to support either contention. We cannot say on the record before us that the result of the ban will be to lessen intoxication, or that the ban will thus promote the general welfare of the community.' *Id.* at 392.

"The attempt of the legislature in enacting paragraph (s) was to equalize the competition between bingo parlors and nonprofit organizations owning their own premises on which to play bingo. As in *Baxter Springs*, however, no statistics have been presented to this Court which would support defendant's contention that equalization of competition is necessary nor is there any evi-

dence that if such equalization of competition is necessary, restricting the playing of bingo in the manner mandated by paragraph (s) would in any way promote the general welfare of the community. Instead, it will make it difficult, if not impossible, for nonprofit organizations which do not have their own premises on which to play bingo to find available leased premises in which to conduct their fundraising activities.

"The Court concludes that paragraph (s) of K.S.A. 79-4706 does not bear a real and substantial relationship to the health, safety, morals or general welfare of the public and it unfairly discriminates between leasing and non-leasing organizations. For these reasons, the Court finds paragraph (s) of K.S.A. 79-4706 to be unconstitutional."

Again, we start our consideration of paragraph (s) with the presumption that it is a valid and constitutional enactment. The legislature has mandated, by paragraphs (q) and (r), that premises may be used only three days a week for bingo, and that one building may not be subdivided and considered as separate premises for bingo purposes. Paragraph (s) extends the legislative decision expressed in (q) and (r) by further separating the premises where bingo can be played and the times bingo can be played. True, as the trial court pointed out, (s) applies only to leased premises. Those organizations using clubrooms or buildings which they own or which they do not lease solely for the purpose of holding bingo games have a fixed base and a fixed location at which they offer bingo. Those nonleasing organizations are limited as to the number of days they may offer bingo, the number of games per day, and the amount of prizes awarded. Further, they may not subdivide their premises.

Those who lease are subject to the same regulations, and in addition, those included in paragraph (s). Since those organizations have no fixed base as do the owning organizations, they may readily rent space some distance from locations where bingo is being offered. This will spread bingo over larger areas and prevent the concentration targeted by paragraphs (q) and (r). We find little in the affidavits to support a conclusion that paragraph (s) is not constitutional. Those organizations which do not own their own premises may not be able to lease the same building or part thereof which they leased in the past, but this regulation does not prevent them from leasing other buildings. The classification appears to bear a rational relationship to the purpose of the regulation: to avoid concentration of bingo and to include a wider area. Fixed base organizations must logically be treated somewhat differently than leasing organizations.

We conclude that paragraph (s) is constitutional.

The judgment is reversed as to K.S.A. 79-4706(q) and (s), and affirmed as to K.S.A. 79-4706(r). The case is remanded to the trial court with directions to terminate the restraining order.